**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ─────────────────── X | | |
| | ) | |
| IN RE: | ) | **Case No. 23-20698-JAD** |
| | ) | **Chapter 7** |
| KATHRYN R. SMITH-FREEMAN, | ) | **Related to ECF Nos. 27, 40** |
| | ) | |
| Debtor. | ) | |
| ─────────────────── X | | |
| | ) | |
| IN RE: | ) | **Case No. 23-20669-CMB** |
| | ) | **Chapter 7** |
| SHAWNTAY M. TARVER, | ) | **Related to ECF Nos. 31, 43** |
| | ) | |
| Debtor. | ) | |
| ─────────────────── X | | |
| | ) | |
| IN RE: | ) | **Case No. 23-20877-CMB** |
| | ) | **Chapter 7** |
| AMANDA C. BAHNY, | ) | **Related to ECF Nos. 25, 36** |
| | ) | |
| Debtor. | ) | |
| ─────────────────── X | | |
| | ) | |
| IN RE: | ) | **Case No. 23-20900-CMB** |
| | ) | **Chapter 7** |
| ASHLEY A. DEHASS, | ) | **Related to ECF Nos. 19, 29** |
| | ) | |
| Debtor. | ) | |
| ─────────────────── X | | |
| | ) | |
| IN RE: | ) | **Case No. 23-20738-GLT** |
| | ) | **Chapter 7** |
| AMY L. LEWANDOWSKI, | ) | **Related to ECF Nos. 30, 46** |
| | ) | |
| Debtor. | ) | |
| ─────────────────── X | | |



---------------------------------------- X
                                         )
IN RE:                                   )    **Case No. 23-20878-GLT**
                                         )    **Chapter 7**
**JEFFREY E. WILLIAMS,**                  )    **Related to ECF Nos. 26, 38**
                                         )
         **Debtor.**                      )
---------------------------------------- X
                                         )
**ANDREW R. VARA, UNITED**                )
**STATES TRUSTEE,**                       )
                                         )
         **Movant,**                      )
                                         )
         **-V-**                          )
                                         )
**RODNEY D. SHEPHERD, ESQ.,**             )
                                         )
         **Respondent.**                  )
---------------------------------------- X

## MEMORANDUM OPINION

     The matters before the Court are motions filed by the Office of the United States Trustee that are each titled as a *Motion of the United States Trustee to Examine Compensation of Debtor's Counsel Pursuant to 11 U.S.C. § 329* (collectively, the "Motions to Examine"), which were filed in the six (6) cases captioned above.[1]

     In due consideration of the facts and circumstances of each case, the Court determines that the Motions to Examine have merit, at least in part. Specifically, the Court finds that the provisions of the fee agreements at issue which impose a factoring fee upon the debtors are unreasonable. The Court also finds that counsel for the debtors failed to adhere to the disclosure requirements under

---

[1] The substance of the Motions to Examine are essentially the same with only minor differences. Unless otherwise expressly indicated, all pinpoint citations within this *Memorandum Opinion* to the Motions to Examine will refer to the Motion to Examine filed in In re Smith-Freeman, 23-20698-JAD, ECF No. 27.

the Bankruptcy Code. Accordingly, for the reasons set forth herein, the Court shall enter an order that requires counsel to disgorge and/or return a portion of the attorney's fees paid by the affected debtors.

## I.
## JURISDICTION

The Motions to Examine are core proceedings over which this Court has subject-matter jurisdiction to hear and decide the Motions to Examine on a final basis. See 28 U.S.C. §§ 157(b)(2)(A) and 1334; see also In re Henderson, 360 B.R. 477, 483 (Bankr. D.S.C. 2006) and the standing *Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc* (W.D. Pa. October 16, 1984) ("...all proceedings arising under Title 11 or arising in or related to a case under Title 11 … be and they hereby are referred to the Bankruptcy Judges of this district for consideration and resolution").

## II.
## BACKGROUND

By the Motions to Examine, the Office of the United States Trustee ("U.S. Trustee") challenges the bifurcated fee agreements[2] Rodney D. Shepherd, Esq. ("Mr. Shepherd") entered into with six (6) debtors who have petitioned for chapter 7 bankruptcy relief in the United States Bankruptcy Court for the Western District of Pennsylvania (the "District"). These six (6) debtors and their cases are: In

---

[2] "Bifurcated fee agreement" is a shorthand term of art bankruptcy courts use when describing the fact that legal counsel entered into two separate fee agreements with his or her client. One agreement covers the services provided, and fees to be earned, by counsel *prior* to a debtor filing for bankruptcy protection. A separate second agreement covers the services provided, and fees to be earned, by counsel *subsequent* to a debtor filing for bankruptcy protection. The reasons for such separate agreements, and their legality, have been debated and described in numerous judicial opinions. See, e.g., United States Trustee v. Cialella (In re Cialella), 643 B.R. 789 (Bankr. W.D. Pa. 2022).

re Smith-Freeman, 23-20698-JAD;[3] In re Tarver, 23-20669-CMB; In re Bahny, 23-20877-CMB; In re DeHass, 23-20900-CMB; In re Lewandowski, 23-20738-GLT; and In re Williams, 23-20878-GLT (collectively, the "Cases").[4]

The Cases are garden variety consumer chapter 7 bankruptcy cases. That is, from a debtor-creditor perspective, the Cases are not complex. For example, excluding the attorney fee issues raised by the U.S. Trustee, the Smith-Freeman case can be summarized as follows:

1. Ms. Kathryn R. Smith-Freeman filed her case as a voluntary chapter 7 case on March 31, 2023. The filing of the initial petition was a "skeletal" or "bare bones" filing (*i.e.*, only the bankruptcy petition was filed, and the schedules, statements, and other documents were filed by counsel later).

2. After the Court granted two extensions of time to file the requisite documents, Ms. Smith-Freeman filed her "completed petition" (*i.e.*, the schedules of assets and liabilities, statement of financial affairs, and related documents) on May 1, 2023.

3. The "completed petition" documents reflect that Ms. Kathryn R. Smith-Freeman was unemployed and receiving unemployment compensation[5] as of the petition date, that her monthly expenses exceeded her monthly income by approximately $523, and that she had approximately $15,010 of assets (the bulk of which is a 2012 Toyota Camry and various personal items) and $20,754 of liabilities (consisting of an existing automobile loan for the 2012

---

[3] In re Smith-Freeman is, in essence, the lead case in these proceedings. Unless otherwise noted, all references to "ECF No. ___" in the body of this *Memorandum Opinion* shall refer to the docket entries in the In re Smith-Freeman case filed at Case No. 23-20698-JAD.

[4] The U.S. Trustee filed a Motion to Examine in each of the Cases identified above. Because each Motion to Examine raised similar issues, and had a common core set of facts, each Motion to Examine was assigned to the undersigned Judge for adjudication. See *Order Consolidating Matters and Scheduling Evidentiary Hearing*, ECF No. 40. Once the Motions to Examine were assigned, the Court consolidated each of the Motions to Examine pursuant to Federal Rule of Civil Procedure 42(a), which is made applicable in bankruptcy by operation of Federal Rule of Bankruptcy Procedure 7042 and Federal Rule of Bankruptcy Procedure 9014(a).

[5] Subsequent to the commencement of the bankruptcy case, Ms. Smith-Freeman obtained employment as a manager at a local restaurant. This employment did not affect the trajectory of her bankruptcy case or its outcome.

Toyota Camry, a deficiency claim, credit cards, and other obligations).

4. Mr. Shepherd described Ms. Smith-Freeman's bankruptcy filing as an "emergency" filing even though no legal actions, repossessions, or foreclosures were pending against her as of the petition date.

5. Ms. Smith-Freeman appeared before the bankruptcy trustee and testified at the meeting of creditors held on June 5, 2023, pursuant to 11 U.S.C. § 341.

6. After the meeting of creditors was completed and closed, the bankruptcy trustee determined that Ms. Smith-Freeman's bankruptcy case is a "no asset" case (*i.e.*, that there are no non-exempt assets of value for liquidation for the benefit of creditors) and issued his report of no distribution.

7. On August 9, 2023, Ms. Smith-Freeman received her bankruptcy discharge without any opposition.

Each of the other Cases followed a substantially similar path and are summarized in the Appendix attached to this *Memorandum Opinion.* Given their similarity, Mr. Shepherd and the U.S. Trustee agreed at the hearing on the Motions to Examine that the Cases are "pretty much the same except obviously the dates." *Transcript of Evidentiary Hearing Held Aug. 8, 2023* ("Hr'g Tr."), ECF No. 57 at 12. Accordingly, per the agreement of counsel, in rendering this decision the Court will discuss the Cases generally using the <u>Smith-Freeman</u> case as the lead case and will note case-specific circumstances if and where appropriate.

With respect to the fees and expenses Mr. Shepherd charged in the Cases, the record reflects that Mr. Shepherd's fee disclosures consist of a dizzying array of filings which can confuse any reader of the Court's docket.

For example, in <u>Smith-Freeman</u>, Mr. Shepherd filed his first set of purported fee disclosures under Bankruptcy Rule 2016 when he filed the completion

documents[6] on May 1, 2023 (approximately one month after the petition date), and this filing included a completed Official Form B2030. See ECF No. 16 at 39.

Thereafter, on May 3, 2023, Mr. Shepherd filed four (4) additional documents which, among other things, revised his Bankruptcy Rule 2016 disclosures. The additional filings for the first time placed on the docket the so-called "bifurcated fee agreements" between Mr. Shepherd and his client (which included the filing of what has been described as the "pre-filing agreements" and the "post-filing agreements" executed by each of the debtors). See ECF Nos. 20–23.

These filings were met by the U.S. Trustee's Motion to Examine, see ECF No. 27, which in turn led to Mr. Shepherd filing more documents. These new filings by Mr. Shepherd included various supplements (see, e.g., ECF No. 29), responses (ECF No. 32), revised disclosures (ECF Nos. 34 and 35), and a status report that allegedly itemized the fees charged and/or earned by Mr. Shepherd along with a summary of the services he allegedly provided (ECF No. 48).

The confusing array of Mr. Shepherd's filings occurred not only in the Smith-Freeman case. They permeated all of the Cases. Mr. Shepherd's filings resulted in an admonition by United States Bankruptcy Judge Carlota M. Böhm in the Tarver case. In Tarver, Judge Böhm sternly stated the following to Mr. Shepherd in an order of court she had entered:

> Initially, Form B2030 was filed at Doc. No. 19 on April 24, 2023. However, six versions of the form are included within Doc. No. 19. An amended version of the form was then filed on the same date at Doc. No. 21. On May 4, 2023, another amended version of the form was filed at Doc. No. 27. Filing multiple versions of the same form causes confusion with respect to the necessary disclosure and makes it difficult to determine what changes were made. It is unacceptable to place the burden on the Court to review and compare

---

[6] The Court uses the phrase "completion documents" to mean the schedules, statements and other documents that chapter 7 debtors are required to file in all cases pursuant to Bankruptcy Rule 1007(b), but which are not filed with the "skeletal" petition.

multiple filings where it is the attorney's duty to properly and fully disclose compensation in the first place. In fact, as to each form Attorney Shepherd certifies that the filing is a complete statement of the arrangement for compensation.

In re Tarver, 23-20669-CMB, ECF No. 29 ¶1 (docket citations in quoted section refer to docket entries in the Tarver case).

After spending an inordinate amount of hours culling through the documents filed by Mr. Shepherd, the Court is now able to summarize Mr. Shepherd's fee arrangements with his clients.

Prior to the petition date in each of the Cases, Mr. Shepherd and his clients executed two documents. One pre-petition document is titled: *Disclosures* [sic] *Requirements Regarding Bifurcated Fee Agreements* (the "Initial Disclosures").[7] The second pre-petition document is titled: *Pre-Filing Agreement* (the "Pre-Filing Agreement").[8]

Mr. Shepherd and his clients also executed a document after the date on which the Cases were commenced. With respect to this third document, it is titled: *Post-Filing Agreement* (the "Post-Filing Agreement").[9]

The gist of the three documents is that the Initial Disclosures provides an overview to the debtors of the options available to them for paying Mr. Shepherd's

---

[7] *Status Report*, In re Smith-Freeman, 23-20698-JAD, ECF No. 20; *Disclosure Statement*, In re Tarver, 23-20669-CMB, ECF No. 22; *Status Report*, In re Bahny, 23-20877-CMB, ECF No. 18; *Status Report*, In re DeHass, 23-20900-CMB, ECF No. 13; *Status Report*, In re Lewandowski, 23-20738-GLT, ECF No. 18; and *Status Report*, In re Williams, 23-20878-GLT, ECF No. 16 (note that while the type-face name of the signature reads "Jeffrey E. Erskine, II," the signature appears to read "Jeff Williams").

[8] *Status Report*, In re Smith-Freeman, 23-20698-JAD, ECF No. 21; *Pre-Filing Agreement*, In re Tarver, 23-20669-CMB, ECF No. 23; *Status Report*, In re Bahny, 23-20877, ECF No. 19; *Status Report*, In re DeHass, 23-20900-CMB, ECF No. 14; *Status Report*, In re Lewandowski, 23-20738-GLT, ECF No. 19; and *Status Report*, In re Williams, 23-20878-GLT, ECF No. 17.

[9] *Status Report*, In re Smith-Freeman, 23-20698-JAD, ECF No. 23; *Post-Filing Agreement*, In re Tarver, 23-20669-CMB, ECF No. 24; *Status Report*, In re Bahny, 23-20877, ECF No. 20; *Status Report*, In re DeHass, 23-20900-CMB, ECF No. 16; *Status Report*, In re Lewandowski, 23-20738-GLT, ECF No. 20; and *Status Report*, In re Williams, 23-20878-GLT, ECF No. 18.

fee. The Pre-Filing Agreement attempts to describe the value of Mr. Shepherd's pre-bankruptcy services and describes the flat fees, if any, that the debtors are to pay to Mr. Shepherd to actually *commence* the Cases. The Post-Filing Agreement attempts to describe the value of Mr. Shepherd's post-bankruptcy filing services and describes the flat fees the debtors are to pay Mr. Shepherd for all the post-petition services provided by counsel to actually *prosecute* the bankruptcy Cases to completion (excepting from such engagement representation in adversary proceedings, contested matters, and for other specified services). Post-Filing Agreement at 2.

More specifically, the Initial Disclosures document is a generalized effort by Mr. Shepherd to summarize his fee arrangements with his bankruptcy clients. In this regard, the Initial Disclosures state that the "normal legal fee" Mr. Shepherd charges for <u>filing and prosecuting</u> a chapter 7 bankruptcy case is an "upfront fee" of $1,425. <u>See</u> Initial Disclosures ¶3. The Initial Disclosures also describes a "financing option" that is available to the client, which adds an "extra fee" payable by the client in the amount of $283.58, for a total fee of $1,708.58 to be paid by the debtor who elects this "Pay Over Time"[10] option. <u>Id.</u> ¶4. The Initial Disclosures further state that "[t]his fee includes a finance charge of 19.9% of the total amount financed ...." <u>Id.</u>

The Initial Disclosures state that any fees paid over time by the client may be "factor[ed]" by Mr. Shepherd with his lender Fresh Start Funding. <u>Id.</u> ¶9. The Initial Disclosures document also contains various representations or acknowledgments by the parties, such as: an acknowledgment that the "pay over time" option is a "last resort" and not a "first choice" by the debtor, <u>id.</u> ¶1; an

---

[10] The *Pre-Filing Agreement* labels the options for payments as "Pay Up Front" and "Pay Over Time." <u>See, e.g.</u>, 23-20878-GLT, ECF No. 17, § A.

acknowledgment by the debtor that, if he or she exercises the "pay over time" option, that both a "pre-filing" agreement and a "post-filing" agreement will be utilized, id. ¶5; an acknowledgment that these agreements are provided to the debtor for review "prior" to "the filing of the bankruptcy case," id.; an acknowledgment that any post-filing agreement is "not discharged" in bankruptcy, id. ¶6; an acknowledgment that the debtor has a 14-day period for entry into any post-filing agreement and, if entered into, a period of time for rescission of the same, id. ¶7; and a statement that Mr. Shepherd has no "ethical concerns" regarding these arrangements and that violations of the pertinent rules of professional conduct are "not implicated," id. ¶10.

The Pre-Filing Agreement restates much of the items referenced in the Initial Disclosures. In addition, Mr. Shepherd represents in the Pre-Filing Agreement that there is certain "Required Minimum Work" that Mr. Shepherd must perform prior to filing the debtor's bankruptcy case in the first instance. See Pre-Filing Agreement at 1. The required minimum work Mr. Shepherd agrees that he must perform under the Pre-Filing Agreement is: "Meeting and consulting with [the debtor] as needed prior to filing [his or her] case;" "Reviewing and analyzing the information from [the debtor's] intake questionnaire and other documents;" "Providing due diligence, legal analysis and legal advice in order to help [the debtor] make important legal choices and to comply with the bankruptcy code and rules;" "Preparing and filing [the debtor's] Chapter 7 Voluntary Petition, Statement about Social Security Numbers, Pre-Filing Credit Counseling Certificate, List of Creditors and any other documents required by local rules to start [the debtor's] Chapter 7 case;" and "Meeting with [the debtor] to review [the debtor's] Petition and related documents and have the [debtor] sign them before [Mr. Shepherd files his or her] case." Id. at 1.

While the required minimum work described in the Pre-Filing Agreement is the proverbial word salad, the Court can describe it in just a few words. That is, the contractually required minimum work that Mr. Shepherd agreed to do for his client in the Pre-Filing Agreement is essentially meeting with his client, advising his client regarding the availability of bankruptcy relief, and the preparation and filing of a "skeletal" or "bare bones" bankruptcy petition (as described above) to initiate a case.

Mr. Shepherd estimated in the Pre-Filing Agreement that the value of the required minimum work to commence a chapter 7 case is $500, but the Pre-Filing Agreement effectively does not charge a fee for the required minimum work when the debtor elects the "zero down" or "Pay Over Time" option. Id.

The Pre-Filing Agreement essentially carves out and excludes from the concept of "required minimum work" any post-petition legal services provided by counsel that are necessary for the debtor to complete his or her bankruptcy case to the satisfaction of the Bankruptcy Code, Bankruptcy Rules, Local Rules, and/or orders of the Court. Id. at 1–2.[11]

The Pre-Filing Agreement states that the chapter 7 completion services are case specific, and include: the preparation and filing of the statement of financial affairs and schedules of assets and liabilities, preparing and filing means test documents, meeting with the debtor to review and sign case completion documents, preparing for and attending the meeting of creditors, administering and monitoring the case, reviewing and responding to trustee requests, drafting and responding to claims and objections to claims, reviewing and advising the debtor regarding any relief from stay motions, reviewing and advising the debtor about

---

[11] As set forth in other parts of this *Memorandum Opinion*, Mr. Shepherd agreed in a separate Post-Filing Agreement to perform the remaining required minimum work (or "Remaining Services" as described *infra*) post-petition.

reaffirmation of debts, and several other services as set forth more fully in the Pre-Filing Agreement (collectively, the "Remaining Services"). Id. at 1–2.

Mr. Shepherd states in the Pre-Filing Agreement that, if he was to bill hourly for the Remaining Services, the "total value of this work" is estimated at $1,425. Accordingly, Mr. Shepherd values his "required minimum work" and "remaining services" at an aggregate value of $1,925—of which the client is actually charged $1,425 if the fees are paid "upfront" or, alternatively, $1,708.58 if the client elects the "zero down" or "Pay Over Time" option. Id. at 3. In this regard, the pertinent part of the Pre-Filing Agreement states as follows:

> Under this agreement, you will have the option– if you choose– to pay some or all of your attorney fee (and, possibly, costs) over time, but still have us go to work immediately to get your chapter 7 case filed. If you choose this "Pay-Over-Time" option (described below), ***whatever portion of your fee that you do not pay up front will be subject to an additional charge of 19.9% for you to make installment payments for 12 months*** (see below for details). Whatever portion of your fee that you pay up front (up to the entire fee) will not be subject to the additional charge for balances paid over time. Because of this, ***the Pay-Over-Time option will cost you more***.

> It is strictly your choice whether to enter into a post-filing agreement, or instead to act pro se or retain a different attorney.

> If you choose to pay your entire fee up front (the "Pay Up Front" option, below), we will provide you with all of the Remaining Services (described above) which includes all of the services needed to successfully complete your chapter 7 case, and this will be the only agreement between us.

> If you choose to pay some or all of your fee over time (the "Pay Over Time" option, below), we will provide you with at least the "Required Minimum Work to File Your Case" (described above) under this Pre-Filing Agreement, and will provide you with the Remaining Services (also described above) under a separate Post-Filing Agreement that you must sign after we file your chapter7 case. You have at least 14 days after the case filing to sign a post-filing agreement or a 14 day period in which your entry into the post filing agreement can be rescinded. Under this option, we have to split our services into two,

separate agreements and you have to sign the second agreement
after your bankruptcy case is filed so that your obligation to pay
your fee is not discharged in your bankruptcy case. You will be pro-
vided with a copy of the proposed Post-Filing Agreement before you
sign this Pre-Filing Agreement, and we encourage you to review it
and ask any question about it that you may have.

If you choose not to sign a Post-Filing Agreement after the Law Firm
has filed your bankruptcy case, the Law Firm (so long as local rules
allow it) will ask the bankruptcy court for permission to withdraw
from representing you. Until and unless the bankruptcy court allows
the Law Firm to withdraw, we will continue to represent you and
provide the Remaining Services to you, at no additional costs, as
described in this Pre-Filing Agreement.

Id. (bold text in original document).

The Post-Filing Agreement in each of the Cases is largely similar to the
Pre-Filing Agreement, except the required minimum services is omitted (because
Mr. Shepherd has already commenced the bankruptcy case by the time the Post-
Filing Agreement is entered into).

The Post-Filing Agreement then, again, sets forth the "Remaining Services"
that Mr. Shepherd agreed to provide to the debtors in each of the Cases and
states that his post-petition non-dischargeable fee totals $1,708.58 (which,
again, is the flat fee of $1,425 plus the financing fee of $283.58). See Post-Filing
Agreement at 3. It also provides that the respective debtor may pay such post-
petition fees in installments over time in intervals that vary from weekly to
monthly. Id. at 3–4.

The Post-Filing Agreement contains a further provision permitting Mr.
Shepherd to factor the post-petition installment payments made by the debtors
and provides that the periodic payments made by the debtors in each of the
Cases are to be made by way of a direct draft against the applicable debtor's
bank account by Fresh Start Funding. Id. at 4 & 7–8.

The record reflects that each of the debtors in the Cases elected the "Pay Over Time" option offered by Mr. Shepherd, and that except for Ms. Smith-Freeman, the fees due from the debtors were factored by Mr. Shepherd with Fresh Start Funding.[12]

The record further reflects that until the latest spate of bifurcated fee cases filed by Mr. Shepherd, counsel routinely charged his clients a flat fee of $1,200 for a simple chapter 7 case. See Motion to Examine ¶27; *Debtor's Counsel's Response to the United States Trustee's Motion to Examine* ("Debtor's Response"), 23-20698-JAD, ECF No. 32 ¶27. However, in March of 2023, Mr. Shepherd increased his flat fee to $1,425 in non-bifurcated cases citing increased costs. See Debtor's Response ¶40. Even at the increased amount of $1,425, this "normal fee" charged by Mr. Shepherd is below the average fee charged by lawyers practicing in this District as previously calculated by the Court in the case of In re Cialella, where Judge Agresti of this Court observed that the "average fee charged in 2022 by local attorneys for a routine Chapter 7 case is approximately $1,500." 643 B.R. at 791 (footnote omitted). The U.S. Trustee appears to agree in this assessment, having stated at the trial that the reasonableness of the $1,425 fee (or even a higher $1,700 fee) is not being contested by the U.S. Trustee, but instead what is contested is the fee arrangement itself. Hr'g Tr. 92.

However, as to the higher "Pay Over Time" fee, the record reflects that Mr. Shepherd has not articulated a basis for charging the debtors in each of the Cases $208.58 more than the District-wide average fee cited above (note,

---

[12] At trial, Mr. Shepherd indicated that Fresh Start Funding would not fund the Pay Over Time option in Ms. Smith-Freeman's case as she was unemployed and receiving unemployment benefits. Hr'g Tr. 12. In light of Fresh Start Funding's refusal to factor the fees from Ms. Smith-Freeman, and given the U.S. Trustee's objections, Mr. Shepherd has indicated that he has waived the fees allegedly due from Ms. Smith-Freeman. Given that the debtors in the other Cases have remitted fees, the matters raised by the Motions to Examine remain a case and controversy requiring adjudication by the Court.

$1,708.58 minus $1,500 equals $208.58) or $283.58 more than the new "normal fee" of Mr. Shepherd's law practice (note, $1,708.58 minus $1,425 equals $283.58), except to acknowledge that there is an administrative cost of factoring fees through Fresh Start Funding.

Mr. Shepherd also has not articulated a reason—well, a reason beneficial to the debtors—as to why the debtors in the Cases were offered the higher cost "Pay Over Time" option as opposed to simply advising his clients to save up the funds for the lower "Pay Up Front" flat fee arrangement, especially since none of the Cases were true "emergency" cases which warranted expedited bankruptcy relief. To the contrary, Mr. Shepherd stated that the fee arrangements were offered, and the Cases were prosecuted, in the way that they were because "if I turn people away, they would just go to someone else." Hr'g Tr. at 62. Mr. Shepherd also remarked, "[b]ut you know, in general, I don't think I should have to wait on my money." Id.

### III.
### THE MERITS OF THE MOTIONS TO EXAMINE

By the Motions to Examine, the U.S. Trustee contends that Attorney Shepherd's bifurcated fee agreements are unreasonable for four (4) primary reasons.

First, the U.S. Trustee contends that the bifurcated arrangements at issue should be cancelled because they are "subterfuge." That is, according to the U.S. Trustee, the bifurcated fee arrangements are "fatally defective" because they mislead as to the "allocation of prepetition and postpetition services" of Mr. Shepherd. See Motion to Examine ¶32. Accordingly, the U.S. Trustee alleges that Mr. Shepherd is engaging in "subterfuge." Id. ¶34.

Second, the U.S. Trustee contends that the bifurcated fee agreements fail to impose upon Mr. Shepherd the ethical duty to provide "presumptive minimal services." <u>See</u> Motion to Examine ¶46.

Third, the U.S. Trustee contends that Mr. Shepherd has impermissibly "upcharged" the debtors as a result of the bifurcated fee arrangement. <u>See</u> Motion to Examine at ¶¶37–43.

Fourth, the U.S. Trustee contends that Mr. Shepherd failed to adhere to disclosure requirements related to attorney transactions with debtors, including the fact that Mr. Shepherd allegedly failed to timely inform the Court about the bifurcated fee agreements he entered into with respect to each of the debtors. <u>See</u> Motion to Examine ¶¶44–45.

On August 8, 2023, the Court conducted an evidentiary hearing on the merits of the Motions to Examine. At the hearing, Mr. Shepherd testified in support of his fee agreements with each of the debtors. The U.S. Trustee offered no other testimonial evidence at the hearing, and numerous documents were offered by both parties and admitted into evidence. The gist of the record made at the evidentiary hearing is summarized above in the *Background* section of this *Memorandum Opinion.*

Upon due consideration of the record made at the evidentiary hearing, the Court finds that the U.S. Trustee's third objection (*i.e.*, excessive, or unwarranted upcharge to fees) and fourth objection (*i.e.*, inadequate disclosure of fee arrangements) have merit, but that the first objection (*i.e.*, subterfuge) and second objection (*i.e.*, failure to provide minimal services) do not.

Because two out of the four objections of the U.S. Trustee have merit, the Court finds that the fee arrangements Mr. Shepherd made with the debtors in each of the Cases are unreasonable to a certain extent thereby warranting a

reduction and disgorgement of some of the fees paid by the debtors (the particulars of which are discussed more fully below).

## A.
## Pertinent Ethical Standards

In order to fully evaluate the Motions to Examine in light of the record made in these proceedings, the Court provides due consideration of the various ethical standards which are implicated by the Motions to Examine.

## 1.

As an initial matter, the Court notes that the law is a noble profession. While lawyers in private practice may be merchants seeking to earn a profit, the law imbues upon counsel substantial professional responsibilities in exchange for the privilege of practicing law. That is, unlike ordinary merchants, lawyers have ethical and fiduciary duties to their clients as required by law. See, e.g., Pennsylvania Rules of Professional Conduct 1.1, 1.4–1.7, 1.15, & 3.3.

In addition to their fiduciary and ethical duties, lawyers to debtors in the bankruptcy arena must also comply with the Bankruptcy Code and Bankruptcy Rules. The Congress created some of those sections—including Bankruptcy Code sections 329, 526, 527, and 528—to protect vulnerable debtors from a lawyer's overreach. See In re Hazlett, 609 B.R. 430, 442 (Bankr. D. Utah 2019).

As one court observed: "[o]ne of the surest means for the bankruptcy system to come under public disrepute is for the perception to take hold that it allows attorneys to milk the last cent out of debtors while leaving creditors nothing. Also disturbing is the prospect that attorneys may be able to extract a premium from debtors who are desperate to file in order to save an asset that is on

the brink of being lost." In re Levin, No. 97-15574DWS, 1998 WL 732878, at *2 (Bankr. E.D. Pa. Oct. 15, 1998).

Section 329 of the Bankruptcy Code is one indicium of the Congress' recognition that a "debtor is in a vulnerable position and is highly dependent on its attorney and therefore will be reluctant to object to the fees of the attorney." Jensen v. United States Trustee (In re Smitty's Truck Stop, Inc.), 210 B.R. 844, 848 (B.A.P. 10th Cir. 1997).

This section of the Bankruptcy Code caps legal counsel's compensation to the "reasonable value" of "any such services" counsel may provide. See 11 U.S.C. § 329(b). Where counsel's compensation is unreasonable, this section also imposes consequences in that the Court may "cancel any such agreement" between attorney and client, id., and the Court may also "order the return of any such payment [received by counsel], to the extent excessive[.]" Id.; see also In re Willis, 604 B.R. 206, 215 (Bankr. W.D. Pa. 2019).

## 2.

Of course, the ability of the Court and the U.S. Trustee to police the protections provided in section 329 of the Bankruptcy Code is dependent upon full and public disclosure of the terms of the fee agreement between attorney and client. In this regard, section 329 of the Bankruptcy Code requires:

> Any attorney representing a debtor in a case under this title, or in connection with such a case, whether or not such attorney applies for compensation under this title, shall file with the court a statement of the compensation paid or agreed to be paid … and the source of such compensation.

11 U.S.C. § 329(a).

This disclosure requirement is important to maintain the integrity of the bankruptcy system and should not be afforded "short shrift" by counsel. As this

Court previously observed, it is well-settled in this District that "the failure to fully disclose the relationships [between the debtor and a lawyer] as required by law can warrant disqualification, denial of compensation, and disgorgement of any compensation already received." Sikirica v. No Respondent (In re Kaib), 448 B.R. 373, 378 (Bankr. W.D. Pa. 2011).

To augment the protections and disclosure requirements of section 329, the Judicial Conference of the United States promulgated Bankruptcy Rule 2016, which provides in pertinent part:

> Every attorney for a debtor, whether or not the attorney applies for compensation, shall file and transmit to the United States trustee within 14 days after the order for relief, or at another time as the court may direct, the statement required by § 329 of the Code including whether the attorney has shared or agreed to share the compensation with any other entity. The statement shall include the particulars of any such sharing or agreement to share by the attorney, but the details of any agreement for the sharing of the compensation with a member or regular associate of the attorney's law firm shall not be required. A supplemental statement shall be filed and transmitted to the United States trustee within 14 days after any payment or agreement not previously disclosed.

Fed. R. Bankr. P. 2016(b).

To make it easier for attorneys to comply with section 329 and Bankruptcy Rule 2016, the Director of the Administrative Office of the United States Courts created Form B2030 *Disclosure of Compensation of Attorney for Debtor*.[13] Attorneys representing consumer debtors in this District—including Mr. Shepherd— are required to file this form to meet their obligations under section 329 of the Bankruptcy Code and Bankruptcy Rule 2016.

---

[13] That form is available at this link: https://www.uscourts.gov/forms/bankruptcy-forms/disclosure-compensation-attorney-debtor-0. The Court provides links to access this and other forms on its website.

Section 329 and Bankruptcy Rule 2016 issues have come up in the context of bifurcated fee agreements in this District before. Just a little over a year ago, Bankruptcy Judge Thomas P. Agresti decided a pair of cases where attorneys representing consumer chapter 7 debtors used bifurcated fee agreements. The lead case, <u>In re Cialella</u>, recounted section 329's requirements and sanctioned an attorney who failed to satisfy section 329's disclosure requirements in twenty cases. The other case involved Mr. Shepherd and was issued the same day as <u>Cialella</u>. <u>See</u> <u>United States Trustee v. Shepherd (In re Shepherd)</u>, 644 B.R. 130 (Bankr. W.D. Pa. 2022).

In <u>In re Shepherd</u>, Mr. Shepherd was found to have violated section 329 when he failed to disclose: (1) his bifurcated fee arrangements in the cases at issue, (2) the fact that a third-party factor was involved, and (3) when he failed to amend his Form B2030 after he received funds from the third-party factor.

A fair reading of Judge Agresti's opinion in <u>In re Shepherd</u> is that Mr. Shepherd did not take heed of this Court's prior holdings regarding section 329 and Bankruptcy Rule 2016. The U.S. Trustee reiterates these concerns before this Court by virtue of the Motions to Examine.

### 3.

In addition to his duty to disclose his fee arrangement, Mr. Shepherd also has the burden of proving its reasonableness. <u>In re Castorena</u>, 270 B.R. 504, 515 (Bankr. D. Idaho 2001). Courts have held that this burden is the same as if counsel was seeking compensation under section 330 of the Bankruptcy Code. <u>Id.</u> (citing <u>Am. Law Ctr. v. Stanley (In re Jastrem)</u>, 253 F.3d 438, 443 (9th Cir. 2001) (remaining citations omitted)).

Bankruptcy courts in the Third Circuit have long held that "[i]t is not un-reasonable to require an attorney seeking compensation to enlighten the court about the nature of his toil and the relation it bears to the case." In re Busy Beaver Bldg. Centers, Inc., 133 B.R. 753 (Bankr. W.D. Pa. 1991) (citing In re Horn & Hardart Baking Co., 30 B.R. 938, 944 (Bankr. E.D. Pa. 1983)), subsequently vacated on other grounds, 19 F.3d 833 (3d Cir. 1994). See also In re: Badyrka, No. 5:20-03618-MJC 2022 WL 4656034 at *8 (Bankr. M.D. Pa. Sept. 30, 2022). Consistent with the longstanding custom in this Circuit, Mr. Shepherd therefore must provide sufficient evidence to preponderantly show the amount of his fee (and his fee arrangement) is reasonable.

### 4.

Bifurcated fee agreements split an attorney's total fee into two components: pre-petition work and post-petition work. Attorneys often structure these agreements such that they perform very little work under the pre-petition agreement and perform the bulk of the work necessary to help a debtor complete a bankruptcy case under the post-petition agreement in exchange for a (presumably) nondischargeable fee. See, e.g., In re Brown, 631 B.R. 77 (Bankr. S.D. Fl. 2021); In re Hazlett, No. 16-30360, 2019 WL 1567751 (Bankr. D. Utah Apr. 10, 2019). See also Memorandum from Ramona D. Elliott, Acting Director, Exec. Off. U.S. Trustees to U.S. Trustees (June 10, 2022);[14] *Final Report of the ABI Commission on Consumer Bankruptcy*, § 3.01 Chapter 7 Attorney's Fees at 89 (American Bankruptcy Institute, 2017–2019).[15]

---

[14] Available at: https://www.deb.uscourts.gov/sites/default/files/news/US%20TRUSTEE%20GUIDE%20FEE%20CH%207.pdf

[15] Available at: available at https://www.nclc.org/wp-content/uploads/2022/08/rpt-abi-commission-on-consumer-bankruptcy-1.pdf

Presumably, debtors enter into these bifurcated fee agreements for one simple reason—they cannot afford to pay attorney fees up front and want to pay the attorney fees over time after a bankruptcy case has been filed.

Attorneys enter into bifurcated fee agreements because it provides for an avenue of payment in the bankruptcy context for two reasons. First, they structure their engagement this way because attorneys (and other professionals) cannot be compensated from estate property in chapter 7 cases, and therefore they have to look to the debtor for payment if no third-party (such as a family member) is willing to pay the fees. See Lamie v. United States Trustee, 540 U.S. 526, 537 (2004). Second, because attorney fees owed under a pre-petition engagement agreement are generally eligible for discharge in bankruptcy, legal counsel unbundle their services so that fees for services provided after a bankruptcy filing may be incurred and paid without violating the discharge injunction against the collection of prepetition debts under 11 U.S.C. § 524. See, e.g., Rittenhouse v. Eisen, 404 F.3d 395, 397 (6th Cir. 2005).

As alluded to above, bifurcated fee agreements are not new to this Court. In Cialella, Judge Agresti surveyed the Bankruptcy Code and relevant authority and concluded that "a bifurcated fee arrangement may be used in Chapter 7 cases in this District[.]" Cialella, 643 B.R. at 793.

Judge Agresti reasoned that attorneys who use bifurcated fee agreements must do so within certain guardrails. Id. To that end, Judge Agresti fleshed out a comprehensive set of principles the Court may use to determine whether a particular bifurcated fee agreement is reasonable. Distilled from the Bankruptcy Code and Rules, those principles highlighted by Judge Agresti in Cialella are:

> 1. "The use of a bifurcated fee arrangement should be a last resort, not a first choice."

2. "The client must be given full disclosure of the bifurcated fee arrangement, including all drawbacks, before entering into such agreement."

3. "The client's choice whether to continue the representation with a post-filing agreement must be freely made and without any financial penalty for not doing so."

4. "While the overall cost to the client for a bifurcated fee arrangement can be larger than for an up-front payment, it must remain reasonable."

5. "The Court must be fully informed about the bifurcated fee arrangement on the petition date and the attorney must be prepared to defend such arrangement if challenged by the Court or the [Trustee]."

6. "A bifurcated fee arrangement that includes a factor or similar entity will be presumed unreasonable, with the burden on the attorney of proving its reasonableness in the event of any challenge."

7. "In no case may the attorney advance filing fees with the expectation of making a recovery from post-petition debtor payments."

Cialella, 643 B.R. 824–828.

Some of these principles are prudential or are based on the Pennsylvania Rules of Professional Conduct ("RPC"),[16] while others flow directly from the Bankruptcy Code and Bankruptcy Rules.

Principle no. 1, for example, is prudentially based and maximizes the efficient delivery of legal services to a client under ethical rules.

Ethical considerations in legal practice emphasize providing competent and diligent representation. See RPC 1.1 *Competence* and RPC 1.3 *Diligence.*[17]

---

[16] Available online at: https://www.padisciplinaryboard.org/for-attorneys/rules/rule/3/The%20Rules%20of%20Professional%20Conduct.

[17] "A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." RPC 1.1. "A lawyer shall act with reasonable diligence and promptness in representing a client." RPC 1.3.

By making bifurcation an arrangement of last resort, clients are required (if possible) to pay for bankruptcy attorney fees upfront, thereby signaling their commitment to the process, and thus fostering a collaborative and efficient attorney-client relationship. The upfront payment enables the lawyer to dedicate his or her time and resources efficiently to the client's case without concerns about delayed payments or collection issues. This ensures that the lawyer can focus on delivering quality legal services promptly and without interruptions, aligning with ethical obligations to act diligently on behalf of the client. Moreover, efficient delivery of services benefits the client and the court system by expediting the resolution of bankruptcy cases.

Principle nos. 2 & 3 flow from sections 526–528[18] of the Bankruptcy Code, which Congress added to the bankruptcy statutes in 2005 via the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA") to enhance the bankruptcy system's protection against attorney overreach.

Sections 526–528 spell out various restrictions and requirements imposed upon attorneys representing consumer debtors in bankruptcy. Pursuant to these statutes, attorneys must provide various detailed disclosures to their clients (§ 527(a)) and must retain a copy of those disclosures for two years (§ 527(d)). Additionally, attorneys must sign written contracts with their clients (§ 528(a)(1)) and must make sure the written contract "explains clearly and conspicuously" what services the attorney will provide, what the services will cost, and how a client should pay the attorney (§ 528(a)(1)). Attorneys who fail to comply may end up having their agreements voided.

---

[18] Congress entitled section 526 "Restrictions on debt relief agencies." Attorneys fall within the definition of debt relief agencies. Milavetz, Gallop, & Milavetz, P.A. v. U.S., 559 U.S. 229, 236–239 (2010) Section 527 is titled "Disclosures," and section 528 is titled "Requirements for debt relief agencies."

Principle no. 4 likewise flows from the Bankruptcy Code. Section 329(b) allows the Court to cancel a debtor's attorney's compensation agreement "[i]f such compensation exceeds the reasonable value…" 11 U.S.C. § 329(b).

Principle no. 5 flows from section 329 and Bankruptcy Rule 2016's disclosure requirements. It underscores those disclosure requirements and relies on the Congress' BAPCPA policies to protect consumer debtors from attorney overreach. See, e.g., 11 U.S.C. §§ 521, 526–528.

Principle no. 6 flows from RPC 1.7 *Conflict of Interest: Current Clients* and requires a bit more context. In some cases involving bifurcated fee agreements, including Cialella and Shepherd, attorneys have "factored" the post-petition fees due counsel from his or her client to a third party. See, e.g., In re Baldwin, 640 B.R. 104 (Bankr. W.D. Ky. 2021); Hazlett, 609 B.R. at 435; but see Brown, 631 B.R. at 99 n. 34 (explaining that there was no factoring in that case). In return, that third party grants the attorneys a line of credit so the attorneys can access funds sooner. Hazlett, 2019 WL 1567751 at *11–12. Instead of paying their attorney, the post-petition agreements often require debtors to pay the balance of their attorney fee directly to the third party (as happened here).

An attorney factoring receivables sets up the potential for a conflict of interest between the attorney and his or her client. RPC 1.7 deals with conflicts of interest involving current clients and provides that a "concurrent conflict of interest exists if … there is a significant risk that the representation … will be materially limited by the lawyer's responsibilities to … a third person or by a personal interest of the lawyer." RPC 1.7(a)(2). A factor no doubt falls into the definition of a "third person" under RPC 1.7.

Clients may waive concurrent conflicts of interest via informed consent. RPC 1.7(b)(4). Absent informed waiver, factoring arrangements presumably present concurrent conflicts of interest. Principle no. 6 requires attorneys to show

that their relationship with a third-party factor does not "materially limit" their representation. Because of this inherent potential conflict, principle no. 6 makes sense in the system the Congress designed to protect against attorney overreach.

Principle no. 7's source is obvious. It is hornbook bankruptcy law that, absent exceptions, pre-petition claims against a debtor are subject to discharge. If an attorney advances a filing fee and expects his client to repay it, he cannot enforce that claim if his client receives a discharge. See 11 U.S.C. § 524; Brown, 631 B.R. at 102–103 (discussing an attorney's advance of a filing fee and noting this type of claim may also present issues under section 526, which prohibits counseling a client to incur pre-petition debt, and section 362—the automatic stay).

The preceding discussion regarding the ethical rules behind the principles set forth in Cialella is not meant to be exhaustive. Rather, it illustrates the great deal of thought and analysis undertaken by Judge Agresti when he rendered his decision in Cialella.

**B.**
**Consideration of the Motions to Examine in Light of Applicable Ethical Standards and the Record Made at Trial**

The U.S. Trustee has asserted four (4) reasons why Mr. Shepherd's bifurcated fee arrangements in the Cases are unreasonable, thereby warranting cancellation of the applicable agreements and disgorgement of the fees paid by each of the debtors. These objections are based upon allegations of: (i) subterfuge, (ii) failure to provide minimal services, (iii) excessive upcharges, and (iv) inadequate disclosures. These objections are addressed below.

**1.**
**Alleged Subterfuge &**
**Failure to Provide "Minimal Services"**

The U.S. Trustee contends that Mr. Shepherd's arrangements with his clients are void because they are "subterfuge." The U.S. Trustee also contends that the arrangements are void because Mr. Shepherd has allegedly skirted his responsibility to provide ethically required "minimal services" to a debtor in bankruptcy.

Beginning with "subterfuge," the U.S. Trustee contends that Mr. Shepherd has clandestinely collected pre-petition fees due from his clients by disguising them as post-petition fees. While the Court finds this argument interesting, the preponderance of the evidence does not support the U.S. Trustee's position.

The beginning point for analyzing the U.S. Trustee's challenge is for the Court to examine the factual record and determine whether it supports "subterfuge." Here, the record reflects that the Pre-Filing Agreement committed Mr. Shepherd to providing unbundled pre-bankruptcy services, which included analyzing whether the debtors were candidates for filing for bankruptcy; and if so, commencing the Cases on behalf of the debtors by preparing and filing a bankruptcy petition and list of creditors only (*i.e.*, the Pre-Filing Agreement did not expressly include preparation of the completion documents required by 11 U.S.C. § 521 and Bankruptcy Rule 1007. This further work was required by the Post-Filing Agreement). The Pre-Filing Agreement estimated the value of these limited services at being only $500.

The record reflects that Mr. Shepherd provided testimony and filed status reports summarizing the actual services he provided, and the U.S. Trustee has neither contested this evidence nor produced any evidence indicating otherwise.

While the Court may have some concern regarding the robustness of the pre-petition services provided by Mr. Shepherd, none of the evidence adduced suggests that Mr. Shepherd did not actually provide the unbundled pre-petition services as provided in the Pre-Filing Agreement. For example, Mr. Shepherd provided an initial consultation to analyze the debtors' situations, reviewed the debtors' credit reports, and prepared the skeletal petitions and lists of creditors for filing. See *Status Report*, ECF No. 48. The uncontested evidence reflects that he spent a little over 2 hours providing these services (and that his standard hourly rate is $275). Also, none of the evidence presented reflects that Mr. Shepherd actually charged his clients for the pre-petition services he provided. Because Mr. Shepherd charged the debtors nothing for these pre-petition services, the U.S. Trustee asserts that the "value" must be hidden in the post-petition fees charged by counsel.

The arguments of the U.S. Trustee in this regard are difficult to follow. In one respect, the U.S. Trustee's "subterfuge" argument appears to encompass a contention that all or some of the alleged post-petition services provided by Mr. Shepherd to advance the Cases to completion did not actually occur post-petition. After all, if the services actually occurred post-petition, then there is no basis to claim that the services are not reflected in Mr. Shepherd's post-petition fee.

But this is not really what the U.S. Trustee is contending because at no time has the U.S. Trustee contested the *bona fides* of the post-petition work performed by Mr. Shepherd. The record bears this out because the preponderance of the evidence is that Mr. Shepherd provided at least 6.4 hours[19] of work in each

---

[19] Mr. Shepherd's Status Report estimates his post-filing services would cost clients $1,764.60 if he billed on an hourly basis. $1,764.60 divided by Mr. Shepherd's $275 hourly rate is 6.42.

of the Cases post-petition. *Status Report*, ECF No. 48 ¶¶2.1–2.22. This work included preparing and filing the schedules, statements of financial affairs, and means test forms; meeting with the debtors to review documents for accuracy; and preparing for and representing the debtors at the meetings of creditors. Id.

The argument of the U.S. Trustee, therefore, must encompass the contention that the value of the post-petition services provided by Mr. Shepherd bore no reasonable relation to the post-petition fixed fees charged in the Cases, and thus the U.S. Trustee asks the Court to draw an inference that Mr. Shepherd clandestinely moved or rolled the contractually stated "value" of his pre-petition services into the post-petition fixed fee he actually charged. This argument, however, is not persuasive because Mr. Shepherd spent at least 6.4 hours providing post-petition work which ultimately led to the debtors obtaining their discharges. Using his hourly rate of $275 per hour, the Court is hard-pressed to conclude that counsel's post-petition services bore no reasonable relation to the fixed or flat fees he charged.

Notwithstanding this state of the record, the Court surmises that the U.S. Trustee's "subterfuge" (or allocation) argument is actually premised upon bankruptcy counsel's ethical duty to provide "minimal" services in any bankruptcy case to ensure that a vulnerable debtor is not abandoned and so that the Court's docket is not filled with orphaned cases which clog the administration of justice. Stated in other words, the U.S. Trustee appears to be contending that ethically required "minimal" services is always tied to a pre-petition fee that may be due counsel, and therefore any post-petition fee earned by counsel can never include fees for services that fall within the rubric of "minimally required services."

This Court's conclusion, and observation, is that the concept of ethically required "minimal services" does not cabin the temporal period of when counsel earns his fee. Nor do ethically required "minimal services" preclude the payment

of a post-petition fixed fee that is reasonably consistent with the value of professional services that counsel provides after a bankruptcy petition is filed.

In canvassing applicable authorities, it is this Court's view that fixing the "minimum level" of competent services into some sort of arbitrary temporal boundary is not contained in any ethical rule, the Cialella principles or implementing requirements,[20] or the Bankruptcy Code. It is this Court's view that it

---

[20] The U.S. Trustee does not dispute that Mr. Shepherd actually provided the "minimum level" of competent services in the Cases. Rather, the U.S. Trustee appears to take issue with the fact that Mr. Shepherd's contractual agreement to provide the "minimum level" of competent services straddles two agreements (the Pre-Filing Agreement and Post-Filing Agreement), as opposed to being all encompassed in the Pre-Filing Agreement.

Cialella *Implementing Requirement* (5), however, states:

> The services to be provided under the pre-filing and post-filing agreements must be clearly set forth, and there must be consistency across both agreements. Furthermore, the following legal services form the minimal threshold for a presumptively reasonable limitation of the scope of representation: an initial client meeting to explain the analysis, preparing and filing of the schedules and Statement of Financial Affairs, and assisting the debtor with the fulfillment of *Section 521* duties.

Cialella, 643 B.R. at 825. Nothing contained in *Implementing Requirement (5)* precludes counsel from providing for ethically required minimal level of services across both agreements. In fact, a number of the minimum level of services in the bankruptcy context occur post-petition, which is why counsel needs to bifurcate their engagement agreement in the first place. In this regard, the Court agrees with the court in In re Slabbinck, which wrote:

> It makes no sense to define competence in a way that pretends that all of the post-petition services a debtor may need, either can or should be performed pre-petition. In most Chapter 7 cases, all of the required documents are filed with the petition. That is certainly optimal in the Court's view, but it is not always the case. There are many cases where an attorney files a bare bones bankruptcy petition quickly, out of necessity, to stay an action by a creditor before there is a sufficient opportunity pre-petition to completely prepare all of the required documents to obtain a Chapter 7 discharge. There are still other cases where, for one reason or another, the attorney does not prepare and file all of the schedules of assets and liabilities, statement of financial affairs and other required documents until after a bankruptcy petition has been filed. The debtors in many of these cases go on to timely file all of their required documents, attend the § 341 meeting and otherwise fulfill all of the requirements needed to obtain a discharge and retain their exempt property. The Court declines to adopt a definition of competency that necessarily implies that an attorney for a debtor in these circumstances has not acted competently just because some of the attorney's work was done after the petition was filed.

In re Slabbinck, 482 B.R. 576, 592 (Bankr. E.D. Mich. 2012).

is a mistake to penalize counsel for providing the "minimum level" of services post-petition by precluding the ability of counsel to be paid without regard to the agreements between attorney and client and without regard to when counsel actually provided such services.

Such artificial boundaries, if accepted, would work a disservice to honest but unfortunate debtors facing exigent circumstances meriting emergency bankruptcy relief (such as foreclosure, eviction, or repossession of important assets). If the artificial boundary applied, it would be a great wall that would subvert the ability of the honest, but distressed debtor to obtain counsel and seek emergency bankruptcy relief because your average working-class debtor does not have sufficient cash resources to pay for counsel's fees upfront. <u>Cf.</u> Elizabeth Warren, *Fixing Our Bankruptcy System to Give People a Second Chance* (last visited January 18, 2024).[21]

The Court further notes that such artificial boundaries have not been created in other situations where unique or important relationships exist between a debtor and third parties. For example, it has been held that a utility company providing electricity or gas service to a debtor occupies a special position with respect to that debtor. <u>See Good Time Charlie's Ltd. v. Black (In re Good Time Charlie's Ltd.)</u>, 25 B.R. 226, 227 (Bankr. E.D. Pa. 1982). Pennsylvania, like many other jurisdictions, has regulations that preclude utilities from terminating services during winter months for certain clients, as well as to those with a proper medical certification. <u>See</u> 66 Pa.C.S.A. §§ 1406(e)(1) & (f); <u>Begley v. Phila. Elec. Co. (In re Begley)</u>, 760 F.2d 46, 51 (3d Cir. 1985) (utility of chapter 7 debtor must follow state law utility regulations if it wants to terminate services). These regulations, like the attorney ethical rules regarding minimally required services,

---

[21] Available at: <u>https://elizabethwarren.com/plans/bankruptcy-reform</u>

predate the filing of a bankruptcy case. Given the existence of these pre-existing regulations, utility companies are required to provide services during winter months and oftentimes after a customer files a bankruptcy petition. These utility service providers are also permitted to be paid by chapter 7 consumer debtors post-petition on account of services actually provided by the utility company after the debtor files his or her bankruptcy case. The Court sees no reason why attorneys, who occupy a similar special position by providing important services to the debtor and whose ability to unilaterally terminate providing legal services is circumscribed by applicable rules of ethics,[22] should be treated any differently.

## 2.
## <u>Alleged Upcharge &</u>
## <u>Reasonableness of Fees</u>

The third and most significant contention by the U.S. Trustee is that the fees earned by Mr. Shepherd contain an excessive "upcharge" for his post-petition services. Here, the U.S. Trustee contends that the total fees charged by Mr. Shepherd are unreasonable in light of both his statements in the record and the work actually performed in each of the Cases.

---

[22] Attorneys who unbundle pre-petition representation with the expectation that a debtor will enter into a post-petition fee agreement do so with the risk that the debtor may change his or her mind and not execute the post-petition fee agreement. Under such circumstances, counsel may find themselves in the unenviable position of working without a fee since the attorney is at the mercy of the court (because court approval is required before counsel may withdraw from the representation). In this regard, *Implementing Requirement (8)* in <u>Cialella</u> provides:

> The pre-filing and post-filing agreements must clearly inform the debtor that notwithstanding anything in the agreements to the contrary, if the debtor chooses not to enter into a postfiling agreement the attorney must still continue to represent the debtor in the bankruptcy, at no additional cost to the debtor, unless and until the Court approves the attorney's withdrawal from the case.

<u>In re Cialella</u>, 643 B.R. at 826.

The Court does share some of the concerns raised by the U.S. Trustee regarding representations made by Mr. Shepherd in his pleadings. For example, the record reflects that Mr. Shepherd made numerous representations that the Cases were commenced as "skeletal" filings because each were "emergencies." Indeed, Mr. Shepherd represented on dozens of occasions in his pleadings that the Cases were "emergency" filings. However, these statements or descriptions of the nature of the filings bear no relation to reality. The Court reaches this conclusion based upon Mr. Shepherd's own testimony, which included the following exchange:

| | |
|---|---|
| Mr. Sisca: | But there was no emergency like a foreclosure? |
| Mr. Shepherd: | Well, no, nothing like that. If there was, we'd be filing a Chapter 13. |
| Mr. Sisca: | Okay. And that's the same for all the cases, right? There was no emergency. |
| Mr. Shepherd: | Well, except outside of their financial situation. |
| Mr. Sisca: | In your response to my Motion, that's Tab 11, you referred to this petition as an emergency nine times by my account. Do we want to go through these all, or does that sound about right to you? |
| Mr. Shepherd: | No. I'll just take your word. I mean, you know, whether you want to call it -- I mean, you know, people call it emergency, they call it skeletal. But that doesn't mean that you have a true emergency, per se. |

Hr'g Tr. 20–21.

Obviously, rushing non-emergency cases into the bankruptcy system is of significant concern. One concern is whether counsel actually engaged in any meaningful examination and analysis of each client's facts and circumstances before a bankruptcy case was filed. The testimony of Mr. Shepherd casts serious doubts as to whether any meaningful analysis occurred before each of the Cases

were expeditiously filed with the Court. On this point, it appears that the singular

and most predominant force driving each of the Cases into bankruptcy was Mr.

Shepherd's desire to be paid a fee. He testified in this exchange as follows:

| | |
|---|---|
| The Court: | No, I get that. But I'm making a case-specific inquiry here on Smith-Freeman. No creditors are looking to repossess assets. No eviction is pending. Those are the facts. Principle 1 says, "Bifurcated last resort, not a first choice." |
| Mr. Shepherd: | Well, you know -- |
| The Court: | Why wouldn't you tell her no, don't do the bifurcation. If you want to do a comfort bankruptcy because psychologically you have debt, stress, you want a fresh start, put some money away. A couple more months if you are diligent about it and disciplined about it, we can file a case for you in a couple of months. |
| Mr. Shepherd: | I mean, I understand where you're coming from. I don't force anybody to go into these agreements. |
| The Court: | I'm not saying that you forced. But attorneys are merchants, no doubt about it. You are a professional. You are in a business. You got to keep the lights on. You have to provide food on the table for yourself and your family. But lawyers are merchants, but also they have additional professional and fiduciary responsibilities. One such example are the principles that are attached to Cialella, that all of the judges of this Court have signed on to. |
| Mr. Shepherd: | Yeah. Well, I mean, Judge Taddonio said, you know, which I think this goes to your question, like, well why don't you just let them make payments to you. I have over the years just a couple months or three months. But you know, in general, I don't think I should have to wait on my money. Like, for instance, this one guy, I called him after I met with Judge Taddonio. And he was going to come in 5:30 the next morning to sign a disclosure agreement. I told him we're not doing |

-33-

> that anymore. He told me well, he'll just make payments to me over the next six months. Well, he's not made any payments yet. But I shouldn't have to wait on my money for six months. ... But I mean, you know, if I turn people away, they would just go to someone else.

Hr'g Tr. 61–62.

Notwithstanding the Court's concern about Mr. Shepherd's "file first" approach, a hindsight review of the record reflects that the debtors in each of the Cases have received a bankruptcy discharge and fresh start, without any objection from creditors or the U.S. Trustee. The Court's own independent review of the record of the Cases is that each affected debtor appeared to be eligible for bankruptcy relief, and thus the source of tension in these Cases is whether the rush to filing was truly in the best interests of the debtors or whether the hurried filings primarily served as a vehicle to boost Mr. Shepherd's bottom line.

To put this concern into perspective, filing and obtaining bankruptcy relief is a tremendous statutory benefit. It also can have risks. Filing a bankruptcy is not always the best option for a debtor to resolve his or her debt. Contrary to the old adage, one size does not necessarily fit everyone.

For example, in some circles bankruptcy comes with a stigma. Whether lawful or not, or morally acceptable or not, that stigma may impact housing, employment, and personal relationships. It also can adversely affect a debtor's credit score thereby decreasing the availability of new credit through higher rates and fees.

Filing for bankruptcy does not necessarily discharge all debts as there are exceptions to discharge and liens pass through bankruptcy unaffected. Filing for bankruptcy also does not mean that a debtor can keep his or her property, because not all assets are exempt from the reach of a liquidating bankruptcy trustee.  Filing for bankruptcy can unintentionally affect family members and other

third parties who are intertwined with the debtor's financial affairs, because such persons under the right circumstances could be targets of avoidance actions brought by a bankruptcy trustee.  Filing a bankruptcy can also limit further bankruptcy relief in any successor case by the debtor, and if the timing of a case is not optimal, a debtor can find himself or herself subject to future circumstances that are more dire.

The parade of horribles described does not mean that bankruptcy is not in the best interest of the honest, but unfortunate debtor. Rather, it means that lawyer and client alike need to "look before they leap" into a bankruptcy. In this regard, counsel should be reminded that clients are more than a receivable, and attorneys in private practice are more than merchants.

Filing a bankruptcy—and invoking the jurisdiction of this Court—is a significant event which requires robust examination and due consideration of the facts and circumstances of each debtor's case. The Court makes this point because the Court is troubled by Mr. Shepherd's testimony that he undertook the "zero down" representations because, had he not done so, "they would just go to someone else."

However, since no party-in-interest has contested the appropriateness of the bankruptcy filings themselves, and because the debtors in each of the Cases have received a discharge, the Court finds that there is insufficient evidence to impose a fee reduction to Mr. Shepherd purely based on his "they would just go somewhere else" testimony.

The Court's decision in this regard is also supported by the fact that the U.S. Trustee presented no evidence to rebut Mr. Shepherd's testimony that he consulted with his clients and "analyzed the case[s] … to make certain that all their properties are exempt and that they're not going to have any problems as far as … preferences…." Hr'g Tr. 44:21–24.

As to the precise fees charged by Mr. Shepherd in each of the Cases, the Court has some confusion as to whether the U.S. Trustee is actually challenging the reasonableness of them. The source of the Court's confusion is a concession made by counsel to the U.S. Trustee at the hearing on the Motions to Examine, where he stated:

> I'm not challenging the reasonableness of the fee. I'm challenging the reasonableness of ... the entirety of the fee arrangement.

Hr'g Tr. 117:15–17.

Regardless of the U.S. Trustee's position, the Court has an independent duty to examine the reasonableness of Mr. Shepherd's fees. In this context, the Court notes that of the $1,708.58 in fees actually charged in each of the cases, $283.58 was a pass-through factoring charge incurred by Mr. Shepherd. It is this factoring fee which the U.S. Trustee contends is part of an impermissible "upcharge."

The Post-Filing Agreement acknowledges the pass-through nature of this expense when it states that Fresh Start Funding "also charges the Law Firm a fee equal to 19.9% of the Pay Over Time Balance that the Law Firm passes on to you, as described above." See *Post-Filing Agreement* at ¶C.2. This "19.9%" sum is equal to $283.58 and is calculated by multiplying the $1,425 flat fee by 0.199.

The essential question presented by this pass-through charge is whether it is the sort of law firm overhead that can be passed along to the debtors in each of the Cases. This Court concludes that the factoring fee cannot be foisted upon the debtors.

In making this determination, the Court has considered the fact that sometimes it is acceptable for attorneys to charge clients for various office expenses, such as postage, photocopying, transcription fees, and short-term computer cloud storage space. There are limitations, however, in the ability of

attorneys to pass these costs on to the client, and that limitation is that the expense must be clearly traced to an attorney's representation of the debtor. In re Thacker, 48 B.R. 161, 164 (Bankr. N.D. Ill. 1985).

The record here reflects that the bifurcation factoring fees charged by Mr. Shepherd are nothing but a coy device by which Mr. Shepherd forces his clients to pay financing fees to Mr. Shepherd's lender—after all, per Mr. Shepherd, he "shouldn't have to wait on [his] money." Hr'g Tr. 62:12. Thus, the pass-through charges are actually traceable to the capital structure of his firm, which includes monetization of receivables. It is in substance payment of overhead incident to the overall operation of the law practice, and is not a necessary component to direct attorney work that Mr. Shepherd does for the affected clients (because none of the cases were "emergencies" and Mr. Shepherd could have required his clients to save up the requisite funds to pay the attorney fees before commencing the cases or, alternatively, Mr. Shepherd could have simply not factored the post-petition fees paid by his clients).

Accordingly, the Court finds that the agreement and practice of imposing the factoring fee of $283.58 is unreasonable in all of the Cases. Cf. In re Wildman, 72 B.R. 700, 731 (Bankr. N.D. Ill. 1987) (expenses which are overhead are not compensable because they are built into the hourly rate of counsel); In re Convent Guardian Corp., 103 B.R. 937, 939–40 (Bankr. N.D. Ill. 1989) (overhead is built into hourly rate; obvious overhead includes rent, taxes, insurance).

The Court's conclusion on the factoring expenses is particularly acute because it appears that Mr. Shepherd had his clients enter into bifurcated fee agreements providing for the pass-through charges without any consideration of whether the debtors would be able to afford the increased cost. See Cialella, 643 B.R. at 826 (increased cost of bifurcated fee arrangement "must be within the debtor[']s apparent financial ability" to pay).

For example, in the cases filed for Ms. Lewandowski and Ms. Smith-Freeman, the respective schedules included a $142.38 monthly expense for Fresh Start Funding, but also indicated an overall negative monthly net income for the debtors at the time of filing.[23]

At trial, Mr. Shepherd was questioned regarding the apparent inability of Ms. Smith-Freeman to afford the "Pay Over Time" fee.

| | |
|---|---|
| Mr. Sisca: | I'm sure you are familiar with Principle 4 of the bifurcation procedures that says you're allowed to charge more for a bifurcated case. But your increased charges have to be within the debtor's apparent financial ability. You read that six times, right? |
| Mr. Shepherd: | Yeah. |
| Mr. Sisca: | Okay. So this debtor is $523.38 negative, thanks in part to $142.38 to Fresh Start Funding. Did this debtor have the apparent ability to pay any post-petition fees, let alone enhanced post-petition fees based on what you're telling me in Schedule J? |
| Mr. Shepherd: | That was not my concern at the time. We discussed everything. But my concern was, for her was the number of -- the amount she had in consumer debt. It did not seem to be that great to me compared to other cases. So I asked her, are you sure you want to do this. And, you know, she's just getting unemployment. And I asked her if she would be getting a job. And she told me, in fact the day we spoke she said she had an interview on such-and-such a date … But in any event, the Code doesn't say a thing about a negative cash |

---

[23] Ms. Lewandowski's *Schedule J* reflects a monthly expense of $142.38 payable to Fresh Start Funding, but an overall monthly net income of −$196.57. 23-20738-GLT, ECF No. 17, ECF pgs. 24–25. In Ms. Smith-Freeman's case, her *Schedule J* reflected monthly net income of -$523.38. 23-20698-JAD, ECF No. 16, ECF pg. 20–21. The Court recognizes that Fresh Start Funding ultimately declined to finance Ms. Smith-Freeman's attorney's fees. However, as indicated by inclusion of the monthly expense on *Schedule J*, it was clearly anticipated that Ms. Smith-Freeman would be liable for that monthly charge.

flow. It doesn't say you have to have a positive
cash flow.

Mr. Sisca:        Thank you, Attorney Shepherd. I believe your tes-
                  timony is that you weren't concerned with Princi-
                  ple 4 and the apparent ability to pay.

Mr. Shepherd:     No, that's not true. I mean, she and I spoke. I
                  mean, I raised that with her, too. But I told you
                  what my main concern was. But, you know, she
                  just kept insisting that she wanted to file. So
                  that's what we did then.

Hr'g Tr. 48–50.[24]

What is clear by this testimony is that Mr. Shepherd wanted his fee and
he set aside any concerns regarding Ms. Smith-Freeman filing for bankruptcy
because that was "what she wanted." This "the customer is always right" attitude
was not just confined to Mr. Shepherd's decision to file the debtors' respective
Cases, but also to the selection of the bifurcated fee option in the first instance.
As Mr. Shepherd stated at trial:

And [Cialella Principle 1] mentions that, you know, I should sit down
with the debtors and discuss that and go through that with them.
And I do with all my debtors. You know, I mean, if they definitely
say they want to do it, what am I supposed to do, just tell them I'm
sorry, we can't do this?

Hr'g Tr. 60.

With respect to Mr. Shepherd's rhetorical question about "what am I sup-
posed to do" in these circumstances "just tell them I'm sorry, we can't do this[,]"
the Court has the answer. It is the Court's view that yes, that is exactly what you

---

[24] Mr. Shepherd did testify that Ms. Smith-Freeman had a job interview scheduled at the time of
their meeting from which she ultimately did later secure employment. However, that does not change the
fact that at the time of filing, any such employment was prospective. See Amended Schedule I, 23-20698-
JAD, ECF No. 47, ¶1 (indicating that as of July 24, 2023 filing, Ms. Smith-Freeman had been employed
for one month whereas the case was commenced on March 31, 2023).

do. You tell them you cannot do it if filing a bankruptcy is not in the client's best interest at the moment.

Lawyers are counselors and advisors. See RPC 2.1 *Advisor*. Lawyers are supposed to exercise independent professional judgment and render candid advice. Id.; see also RPC 1.7 *Conflicts of Interest*, and *Comment;* Dignity Health v. Seare (In re Seare), 493 B.R. 158, 189 (Bankr. D. Nev. 2013) ("A bankruptcy lawyer cannot assume that a client knows what a bankruptcy will or will not do for her[;]" that is why the advice of bankruptcy lawyers is sought).

Not providing that candid advice, and blindly caving to the whim of an uninformed client, violates some of the basic ethical duties imposed upon counsel. Accordingly, the Court will not allow the factoring fee under these circumstances.

What remains then is the $1,425 fixed fee charged by Mr. Shepherd in each of the Cases, and whether these charges are reasonable when compared to the post-petition services he actually performed.

Also relevant is the question of what standard the Court should utilize to evaluate Mr. Shepherd's fees. Here, bankruptcy courts have utilized various methodologies to examine the reasonableness of counsel's fees. These methodologies include deference to the bankruptcy court's general knowledge and experience in administering its docket, cf. Busy Beaver Bldg. Centers, 19 F.3d at 854, to utilizing section 330 of the Bankruptcy Code as a guidepost for the Court's discretion. See In re Dean, 401 B.R. 917, 922 (Bankr. D. Idaho 2008) (citing In re Jastrem, 253 F.3d 438 (9th Cir. 2001)).

Regardless of the methodology used, "the setting of fees ... is an art, not a science." In re Gillett Holdings, Inc., 137 B.R. 462, 467 (Bankr. D. Colo. 1992). Underlying the Court's discretion is the consideration of both the necessity of

the services provided and, as set forth above, the inherent fairness of the fee charged by counsel. Id.

Sub judice, the history and experience of the Bankruptcy Judges of the Western District of Pennsylvania is that the average fee charged by counsel in a simple chapter 7 case commenced during the period of 2016 through 2022 is $1,500. Cialella, 643 B.R. at 791 & n.2. The U.S. Trustee contends that this average includes pre-petition work of counsel and argues that logic dictates that the reasonable value of post-petition work of counsel in each of the Cases should be materially less than $1,500.[25]

The Court cautions the use of the average fee amount in Cialella as a *per se* fee because average fees are just that—averages. Some counsel charge less; some counsel charge more. At the end of the day, the question of whether a fee is reasonable turns upon a number of factors, including but not limited to, the inherent fairness of the fee in relation to the work actually performed, the results obtained, the complexity of the matter, and in due regard to the marketplace. See e.g. In re Dorn, 443 B.R. 555, 557 (Bankr. M.D. Fla. 2011), on remand Nos. 6:10-bk-06282-KSJ, 6:10-bk-12174-KSJ, 2012 WL 1038786 (Bankr. M.D. Fla. March 26, 2012).

The Court in Cialella attempted to craft a fairness component with respect to fixed fees for simple chapter 7 cases in the bifurcation context. The implementing requirements in Cialella acknowledged that the fees in a bifurcated scenario can be up to 20 percent higher than an ordinary pre-petition paid-in-full fixed fee (given the extra work and risk associated with bifurcated

---

[25] Courts have held that it is inappropriate to measure the reasonableness of a post-petition fee solely by comparing the charge to the fees assessed pre-petition. See Brown, 631 B.R. at 93 (citing In re Carr, 613 B.R. 427 (Bankr. E.D. Ky. 2020)). Rather, the reasonableness of the fee, whether it is pre-petition or post-petition, is to be analyzed on the basis of the services actually provided. Id.

representations) and still be presumed reasonable. With respect to the District's average fee, this means that bifurcated fees in an amount of less than $1,800 are presumed reasonable. See Cialella, 643 B.R. at 826 (if the total fee charged "in the bifurcated fee arrangement is less than 20% more than what an up front fee would be, it will be presumed reasonable"). Of course, Mr. Shepherd's fee falls below this threshold based upon District averages, which militates in favor of allowance of his fee.

It is undisputed that Mr. Shepherd (a solo practitioner with more than 30 years of experience and whose regular rate in hourly fee cases is $275 per hour) provided at least 6.4 hours of work in each of the Cases post-petition. See *Status Report*, ECF No. 48 ¶¶2.1–2.2. Mr. Shepherd's 6.4 hours of work included preparing and filing schedules statements of financial affairs, and means test forms; meeting with the debtors to review these documents for accuracy; and preparing and representing the debtors at the meeting of creditors. Id. This work ultimately led to the debtors receiving a discharge in each of the Cases. These circumstances lead to the Court's conclusion that the $1,425 charged by Mr. Shepherd falls within the range of reasonableness.

This conclusion should not be contested by the U.S. Trustee, as counsel to the U.S. Trustee stated at the hearing on the Motions to Examine that the U.S. Trustee "certainly ha[s] no quarrel with $1,425." Hr'g Tr. at 97. Counsel to the U.S. Trustee further acknowledged that: "I'm not saying that $1,425 or 1,700 or however he's charging is unreasonable. The question is whether the fee arrangement is unreasonable." Id. at 92.

Perhaps the U.S. Trustee's quarrel with the $1,425 fixed fee charged by Mr. Shepherd is the fact that he previously charged $1,200 per chapter 7 case prior to Judge Agresti's issuance of the Cialella decision. Mr. Shepherd, however,

testified that he had not raised his fees in years and recently increased his stand-ard flat fees to offset rising costs.

In response to this testimony, the U.S. Trustee has offered no authority categorically precluding an attorney from raising his rates or fees. The Court has also performed its own independent research found no compelling authority which precludes lawyers from participating in the marketplace and raising their rates as long as the fees charged are reasonable.

Accordingly, the state of the record in these Cases is that $1,425 of the fixed fees Mr. Shepherd charges appear to be reasonable, assuming his required disclosure duties were met. As set forth below, the record reflects that they were not, thus warranting a further reduction in his compensation. In re Dorn, 443 B.R. at 557 (after calculating the reasonable fee, a court may consider other fac-tors to adjust the fee upward or downward).

### 3.
### Inadequate Disclosures

The U.S. Trustee's fourth contention is that Mr. Shepherd's fee arrange-ment should be cancelled because Mr. Shepherd failed to disclose his bifurcated fee arrangements to the Court in a timely manner. The U.S. Trustee's objection also is that Mr. Shepherd's disclosures, when made, were woefully deficient thereby warranting the consequence of disallowance or reduction of his fees. As to this latter point (i.e., the inadequacies of his disclosures), the Court agrees.

First, as to the timing of Mr. Shepherd's disclosures, Cialella *Principle 5* requires that counsel "fully inform" the Court about the bifurcated fee arrange-ment "on the petition date." See Cialella, 643 B.R. at 826. The record in this case is that Mr. Shepherd did not do that, and he has stated a valid reason why.

The *Implementing Requirements* to <u>Cialella</u> *Principle 5* state that the disclosure filed by counsel must "clearly set forth when a bifurcated fee arrangement is being used[,] the dates on which the [pre-and-post-filing] agreements were signed by the debtor, and the key terms of the arrangement." <u>Id.</u> at 826–27. As Mr. Shepherd pointed out while testifying, it is impossible for an attorney to disclose on the petition date the date a debtor signed a post-filing agreement because, by definition, a post-filing agreement is actually signed by the debtor <u>after</u> the petition date. <u>See</u> Hr'g Tr. 35.

The aim of <u>Cialella</u> *Principle 5* is to make sure attorneys know they must tell the Court when they use bifurcated fee agreements. This is because "[t]he Court has a duty to oversee fee agreements between debtor attorneys and their clients" and because "the potential for abuse is high." 643 B.R. at 826; <u>see also</u> Fed. R. Bankr. P. 2017. It is this potential for abuse which prompted <u>Cialella</u> *Principle 5*'s requirement of disclosure on the petition date.

Although attorneys should make their disclosures as soon as possible, the plain language of Bankruptcy Rule 2016 gives attorneys a little leeway.

Bankruptcy Rule 2016 requires debtor's attorneys to make their disclosures "within 14 days after the order for relief, or at another time as the court may direct[.]" Fed. R. Bankr. P. 2016(b). In these Cases, Mr. Shepherd filed several motions seeking additional time to complete his clients' filings and the Court granted them. Included in these filings for which an extension of time was granted is the original Form B2030 that Mr. Shepherd filed. <u>See</u> Petition Completed, ECF No. 16 at 39.

The record thus reflects that in these Cases, Mr. Shepherd ultimately filed his original Form B2030s within the extended time period the Court allowed. <u>See, e.g.</u>, *Order Granting Motion to Extend Time to Complete the Bankruptcy Filing*, ECF No. 11; *Order Granting Motion to Extend Time to Complete the Bankruptcy*

*Filing*, ECF No. 14. For this reason, the objections of the U.S. Trustee based upon timing are overruled.

Where there is an issue, however, is the substance of Mr. Shepherd's disclosures. In these Cases, Mr. Shepherd's disclosures lacked the substance the Bankruptcy Code and Bankruptcy Rules require.

An attorney's "disclosure under [Bankruptcy] Rule 2016(b) must be precise and complete." 9 Collier on Bankruptcy ¶2016.20 (16th 2023). In these Cases, Mr. Shepherd's disclosures were neither precise nor complete.

At the evidentiary hearing, the U.S. Trustee examined Mr. Shepherd about the numerous errors and discrepancies on his Form B2030s. See Hr'g Tr. 14–34. For example, the U.S. Trustee examined erroneous dates, misstated fee amounts, incorrect debtor names, cluttered dockets because of software issues, and more. Id.

For example, as stated above, in Tarver Mr. Shepherd filed six versions of Form B2030 with the completion documents which prompted Judge Böhm to issue an order admonishing Mr. Shepherd for the confusion he caused and directing that he take clarifying action. *Order*, In re Tarver, 23-20669-CMB, ECF No. 29. At trial, Mr. Shepherd attributed "this type of situation" to his misunderstanding of his computer software. Hr'g Tr. 16. As previously held by this Court in Willis, however, the "computer did it" defense is not a viable one. 604 B.R. at 209–210.

Moreover, as highlighted in trial testimony, the inundation of competing Form B2030s was hardly the only issue. The gist of the evidence is that Mr. Shepherd's Form B2030s in these Cases were a mess, as Mr. Shepherd admitted at trial:

> Mr. Sisca:        Okay. To wrap this up, there's five Form 2030s of record [in Smith-Freeman]. Which one should I

|                 |                                                                                                                                                                     |
|-----------------|---------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|                 | refer to if I want to know what the true state of affairs is, if I want to know what you're certifying is a complete statement of any agreement or arrangement for payment. Which one should I look at? |
| Mr. Shepherd:   | I think the last one that I filed, although like I said, it has Tarver on there. So that would be incorrect. |
| Mr. Sisca:      | And it also has the discrepant dates. |
| Mr. Shepherd:   | The dates are different. So I guess you could say that's completely wrong. |
| Mr. Sisca:      | Well, I'll agree with you. I'm asking which one I need to look at to try to get the most accurate, which of these five? Or do I have to pick a name from one and an amount from another and a date from another? |
| Mr. Shepherd:   | Well. Well, I guess the one with the petition would be the closest. But it's wrong, too. So. |
| Mr. Sisca:      | After you filed the fifth one, there's a corrective entry on the docket, Entry Number 36, June 16th. |
| Mr. Shepherd:   | Yeah. I was seeing that, and I didn't file the correction. |
| Mr. Sisca:      | You don't want to let me ask the questions anymore. My question was going to be were you aware that there was a corrective entry telling you to refile because either the wrong PDF or the wrong name was in your Rule 2016 statement. |
| Mr. Shepherd:   | Well, I will state that, no, I just looked at that again today. I was going over everything, and I saw that for the first time. So that was my error that I missed that. But – |
| Mr. Sisca:      | But you don't feel obligated to correct the record when you get a corrective entry? |

| Mr. Shepherd: | Well, no, that's not true. I mean, if I was aware of it. I just, for some reason, I didn't become aware of it. |
| Mr. Sisca: | Do you have any idea what that reason was? |
| Mr. Shepherd: | Well, I guess people have all kinds of reasons. I guess it just slipped through the cracks. |
| Mr. Sisca: | So, you won't point to a document that's accurate, or even close to accurate. You won't amend when the Court tells you to. But you're still disagreeing with me when I take issue with your characterizing this all as de minimis? |

Hr'g Tr. 30–32.

As exemplified in the exchange, the errors and irregularities the U.S. Trustee highlighted show that Mr. Shepherd's Form B2030s lacked the substance the Court and the U.S. Trustee needed to review Mr. Shepherd's fee arrangements.

One significant matter the Court takes issue with is Mr. Shepherd's identification of the source of compensation to be paid on his Form B2030s as being from the debtors. See In re Tarver, 23-20669-CMB, ECF No. 38 ¶4; In re Bahny, 23-20877-CMB, ECF No. 16, ECF pg. 42 ¶4; In re DeHass, 23-20900-CMB, ECF No. 17, ECF pg.45, ¶4; In re Lewandowski, 23-20738-GLT, ECF No. 39, ¶4; and In re Williams, 23-20878-GLT, ECF No. 32, ¶4.

In reality, Mr. Shepherd received his compensation from Fresh Start Funding—making his representation just plain untrue. See Ferrara & Hantman v. Alvarez (In re Engle), 124 F.3d 567, 572 (3d Cir. 1997) (when "compensation is to come from some source outside the estate," review is subject to section 329 of the Bankruptcy Code); In re Harris Agency, LLC, 468 B.R. 702, 707 (Bankr. E.D. Pa. 2010) (debtor's attorney must disclose the source of compensation, even if the source is not the debtor but a third-party entity) (citation omitted); Schroeder v. Rouse (In re Redding), 263 B.R. 874 (B.A.P. 8th Cir. 2001) (disclosure of compensation "must be filed whether or not the attorney applies for the

compensation to be paid from property of the estate and whether or not the at-
torney is in fact paid from property of the estate. The Code and Rules require,
without exception, that the amount and source of the compensation be dis-
closed").

Moreover, it appears that Mr. Shepherd does not truly appreciate the seri-
ousness of his disclosure failures. Highlighted at trial was the seemingly flippant
attitude Mr. Shepherd had toward his conduct, which would include his errors
and omissions. As referenced in the above exchange, Mr. Shepherd stated at the
hearing that if it was found that he did anything wrong, he believes such conduct
to be "de minimis." Hr'g Tr. 10.[26]

The Court disagrees. Instead, the magnitude of the errors and omissions
"forced [the Court and the U.S. Trustee] to be detectives, clairvoyants, or sooth-
sayers to figure out exactly what [Mr. Shepherd's] arrangement [was] with his
clients" in these Cases. Kaib, 448 B.R. at 379; see Hr'g Tr. 27.

Courts have explained that the default sanction for attorneys who violate
their disclosure obligations could be full disgorgement of all fees. See, e.g., In re
Aquilino, No. 20-15628 (JNP), 2023 WL 2191494, at *7 (Bankr. D.N.J. Feb. 23,
2023) (quoting Mapother & Mapother, P.S.C. v. Cooper (In re Downs), 103 F.3d
472, 478 (6th Cir. 1996) (also holding that "the bankruptcy court should deny
all compensation to an attorney who exhibits a willful disregard of his fiduciary
obligations to fully disclose the nature and circumstances of his fee arrangement

---

[26] Another example of Mr. Shepherd's flippant approach to fee disclosures concerns his explana-
tion as to why he did not correct his errors in the Smith-Freeman case when prompted by a corrective en-
try issued on the Court's docket. In this regard, Mr. Shepherd testified at trial that: "I will admit in this
case I didn't [correct the filings]. And why, I can't definitively say why. But if you noticed, I think one of
the reasons it could be is, as I said, I'm getting no fee out of this." Hr'g Tr. at 32. Contrary to Mr. Shep-
herd's excuse, counsel's duty of disclosure under applicable law is not vitiated by the fact that counsel is
not getting paid. See 11 U.S.C. § 329(a); Bankruptcy Rule 2016(b) (requiring disclosure "whether or not
the attorney applies for compensation").

under § 329 and [Bankruptcy] Rule 2016") and citing <u>SE Prop. Holdings, LLC v.</u>
<u>Stewart (In re Stewart)</u>, 970 F.3d 1255, 1267–1268 (10th Cir. 2020) ("full dis-
gorgement … should be the default sanction" for violating section 329)); <u>see also</u>
<u>Morris v. King (In re Rosales)</u>, 621 B.R. 903, 928 (Bankr. D. Kan. 2020) (same).

Ultimately, it is up to the Court's discretion as to the extent to which coun-
sel should disgorge fees because courts may sanction attorneys with less than
full disgorgement when the facts and circumstances warrant it or when the vio-
lation is a technical one. <u>See</u> <u>Stewart</u>, 970 F.3d at 1267–1268.

The record in these Cases shows that Mr. Shepherd's disclosures lacked
the substance section 329 and Bankruptcy Rule 2016 require. Furthermore, this
is not Mr. Shepherd's first instance of nondisclosure. <u>See</u> <u>Shepherd</u>, <u>supra</u>.
These circumstances require a meaningful sanction, and the Court determines
that the sanction should be a further reduction of compensation of $1,000 per
Case as a result of Mr. Shepherd's continuous and repetitive failure to comply
with the rules and regulations relating to disclosure of attorney compensation
arrangements in bankruptcy.

The Court elects to not impose a greater sanction because, as set forth
above, Mr. Shepherd did successfully obtain a discharge on behalf of all of his
clients in the Cases. The record reflects that none of the clients have complained
regarding the value and competency of Mr. Shepherd's services. Under these
circumstances, where the constituency occupying the best position to evaluate
the quality of Mr. Shepherd's representation has not objected,[27] it appears to the
Court that Mr. Shepherd should be paid at least some fee for his professional
services. Given the facts and circumstances of the Cases, including the

---

[27] Courts have reduced compensation to attorneys due to the poor quality of their work. <u>See, e.g.</u>,
<u>Hale v. U.S. Trustee</u>, 509 F.3d 1139 (9th Cir. 2007) (petition documents incomplete and erroneous requir-
ing amendments).

deficiencies and problems described in this *Memorandum Opinion*, the Court concludes that a fee of $425 per case is a reasonable outcome.

## IV.
## CONCLUSION

For all of the reasons set forth above, the Court determines that the U.S. Trustee's Motions to Examine have merit, at least in part. Specifically, the Court finds that the provisions of the fee agreements at issue which impose a factoring fee upon the debtors are unreasonable. The Court also finds that counsel for the debtors failed to adhere to the disclosure requirements under the Bankruptcy Code.

As a result, all applicable fee agreements are cancelled to the extent they provide for clients in the Cases paying attorney fees in excess of $425.[28]

To the extent any debtors in the Cases have actually remitted fees in excess of $425 to Mr. Shepherd (or to his factor Fresh Start Funding), Mr. Shepherd is directed to, within sixty (60) days hereof, (a) disgorge and return the fees in excess of the $425 paid by the debtors to Mr. Shepherd or his factor Fresh Start Funding; and (b) file with the Court an affidavit providing an accounting of the same and certifying that the disgorgement has been completed.

An order consistent with this *Memorandum Opinion* shall be issued.

FILED
1/24/24 3:22 pm
CLERK
U.S. BANKRUPTCY
COURT - WDPA

Date: January 24, 2024

The Honorable Jeffery A. Deller
United States Bankruptcy Judge

---

[28] Stated in other words, counsel's fees shall be reduced by $1,283.58 in each Case (i.e., reduced by the improper factoring fee of $283.58 and disallowance of $1,000 of fees due to inadequate disclosures). The math as to the allowed fees is as follows: $1,708.58 minus $1,283.58 equals $425.

Case Administrator to Mail to:

Debtors
Office of the United States Trustee
Rodney D. Shepherd, Esq.

# **Appendix**

This *Appendix* lays out the case history in each of the Cases (other than

Smith-Freeman) discussed in the *Memorandum Opinion.*

In re Tarver, 23-20669-CMB, was filed as a voluntary chapter 7 case on

March 29, 2023.

- The filing of the initial petition was a "skeletal" or "bare bones" filing (i.e., only the bankruptcy petition was filed, and the schedules, statements, and other documents were filed by counsel later).

- After the Court granted one extension of time to file the requisite documents, Ms. Shawntay M. Tarver filed her "completed petition" (i.e., the schedules of assets and liabilities, statement of financial affairs, and related documents) on April 24, 2023.

- The "completed petition" documents reflect that as of the petition date, Ms. Tarver was employed as a Mail Handler with the U.S. Postal Service, that her monthly income exceeded her monthly expenses by only approximately $60, and that she had approximately $13,933 of assets (the bulk of which consists of a 2011 Nissan Altima (listed on *Schedule A/B* as "Ultima") and various items of personal property) and $58,455 of liabilities (consisting of unpaid student loans, deficiency claims on account of vehicle repossession/voluntary surrender, credit card obligations, an overpayment of unemployment compensation, and medical debt).

- Attorney Shepherd described Ms. Tarver's bankruptcy filing as an "emergency" filing even though no legal actions, repossessions, or foreclosures were pending against her as of the petition date.

- Ms. Tarver appeared before the bankruptcy trustee and testified at the meeting of creditors held on June 26, 2023, pursuant to 11 U.S.C. § 341.

- After the meeting of creditors was completed and closed, the bankruptcy trustee determined that Ms. Tarver's bankruptcy case is a "no asset" case (i.e., that there are no non-exempt assets of value for liquidation for the benefit of creditors) and issued her report of no distribution.

- On August 30, 2023, Ms. Tarver received her discharge in bankruptcy without any opposition.

In re Bahny, 23-20877-CMB, was filed as a voluntary chapter 7 case on

April 24, 2023.

- The filing of the initial petition was a "skeletal" or "bare bones" filing.

- The initial petition filed on behalf of the debtor incorrectly identified the debtor's last name as "Bahney" as opposed to "Bahny." As a result, Mr. Shepherd had to promptly correct the petition the very next day.

- After the Court granted one extension of time to file the documents necessary to administer this case, Ms. Amanda C. Bahny then filed her "completed petition" on May 18, 2023.

- The "completed petition" documents reflect that as of the petition date Ms. Bahny was employed with Caremark handling "benefits set-up testing," that her monthly income exceeded her monthly expenses by only approximately $100, and that she had approximately $1,768 of personal property assets and $100,291 of liabilities (mostly consisting of unpaid student loans and credit card debt).

- Attorney Shepherd described Ms. Bahny's bankruptcy filing as an "emergency" filing even though no repossessions or foreclosures were pending against her as of the petition date. The filings, however, do indicate one collection action was pending by a credit card company, and that action was not yet reduced to judgment.

- Ms. Bahny appeared before the bankruptcy trustee and testified at the meeting of creditors held on July 3, 2023, pursuant to 11 U.S.C. § 341.

- After the meeting of creditors was completed and closed, the bankruptcy trustee determined that Ms. Bahny's bankruptcy case is a "no asset" case and issued his report of no distribution.

- On September 6, 2023, Ms. Bahny received her bankruptcy discharge without any opposition.

In re DeHass, 23-20900-CMB, was filed as a voluntary chapter 7 case on

April 27, 2023.

- The filing of the initial petition was a "skeletal" or "bare bones" filing.

- After the Court granted one extension of time to file the documents necessary to administer this case, Ms. Ashley A. DeHass filed her "completed petition" on May 22, 2023.

- The "completed petition" documents reflect that, as of the petition date, Ms. DeHass was employed as an IT Analyst for the Allegheny Health Network, that her monthly income exceeded her monthly expenses by only approximately $91, and that she had approximately $37,311 of assets (the bulk of which is a fully encumbered Ford Bronco Sport and exempt

retirement assets) and $173,980 of liabilities (which are predominantly student loans and some credit card debt).

- Attorney Shepherd described Ms. DeHass's bankruptcy filing as an "emergency" filing even though no collection actions, repossessions or foreclosures were pending against her as of the petition date.

- Ms. DeHass appeared before the bankruptcy trustee and testified at the meeting of creditors held on July 28, 2023, pursuant to 11 U.S.C. § 341.

- After the meeting of creditors was completed and closed, the bankruptcy trustee determined that Ms. DeHass's bankruptcy case is a "no asset" case and issued his report of no distribution.

- On September 27, 2023, Ms. DeHass received her bankruptcy discharge without any opposition.

In re Lewandowski, 23-20738-GLT, was filed as a voluntary chapter 7 case on April 4, 2023.

- The filing of the initial petition was a "skeletal" or "bare bones" filing.

- After the Court granted two extensions of time to file the documents necessary to administer this case, Ms. Amy L. Lewandowski filed her "completed petition" on May 2, 2023. However, a corrective entry was issued by the Court directing that Mr. Shepherd correct certain deficiencies on Form B2030. Mr. Shepherd filed an Amended Form B2030 the following day.

- The "completed petition" documents reflect that, as of the petition date, Ms. Lewandowski was employed as a Medical Assistant for the University of Pittsburgh Medical Center Health System (UPMC), that her monthly expenses exceeded her monthly income by approximately $200, and that she had approximately $16,503 of assets (the bulk of which is a 2016 Kia Forte and exempt retirement assets) and $29,222 of liabilities (which are predominantly student loans and some credit card debt).

- Attorney Shepherd described Ms. Lewandowski's bankruptcy filing as an "emergency" filing even though no collection actions, repossessions or foreclosures were pending against her as of the petition date.

- Ms. Lewandowski appeared before the bankruptcy trustee and testified at the meeting of creditors held on June 5, 2023, pursuant to 11 U.S.C. § 341.

- After the meeting of creditors was completed and closed, the bankruptcy trustee determined that Ms. Lewandowski's bankruptcy case is a "no asset" case and issued his report of no distribution.

- On August 9, 2023, Ms. Lewandowski received her discharge without any opposition.

<u>In re Williams</u>, 23-20878-GLT, was filed as a voluntary chapter 7 case on

April 24, 2023.

- The filing of the initial petition was a "skeletal" or "bare bones" filing.

- After the Court granted one extension of time to file the documents necessary to administer this case, Mr. Jeffrey E. Williams filed his "completed petition" on May 18, 2023.

- The "completed petition" documents reflect that, as of the petition date, Mr. Williams was employed as a Care Associate with Cigna, that his monthly income exceeded his monthly expenses by only approximately $140, and that he had approximately $58,487 of assets (the bulk of which is a 2010 Chevrolet Cobalt, a 2005 Chevrolet Cobalt, and exempt retirement assets) and $79,292 of liabilities (which are predominantly student loans and credit card debt).

- Attorney Shepherd described Mr. Williams bankruptcy filing as an "emergency" filing even though no collection actions, repossessions or foreclosures were pending against him as of the petition date.

- Mr. Williams appeared before the bankruptcy trustee and testified at the meeting of creditors held on July 3, 2023, pursuant to 11 U.S.C. § 341.

- After the meeting of creditors was completed and closed, the bankruptcy trustee determined that Mr. Williams' bankruptcy case is a "no asset" case and issued his report of no distribution.

- On September 6, 2023, Mr. Williams received his discharge without any opposition.